# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES B. STUBBLEFIELD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:06cv1018 CAS** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael Astrue, the Commissioner of Social Security ("Commissioner"), denying James B.

Stubblefield disability insurance benefits ("DIB") under Title II of the Social Security Act

("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under

Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.  Plaintiff has filed a brief in support of his

complaint; the Commissioner has filed a brief in support of his answer.  The case was referred

to the undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

### Procedural History

James Stubblefield ("Plaintiff") applied for DIB and SSI in February 2005, alleging he

was disabled as of that month by arthritis in his left hip and right knee and by Legg-Calvé-

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and
is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Perthes disease.[2]  (R. at 35-39, 86-88.)[3]  These applications were denied initially and after a

hearing held in November 2005 before Administrative Law Judge ("ALJ") Jhane Pappenfus.

(Id. at 12-21, 30-34, 44, 104, 166-86.)  The Appeals Council denied Plaintiff's request for

review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id.

at 3-5.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative

hearing.

Plaintiff testified that he lived with his wife and, occasionally, his stepdaughter.  (Id.

at 170.)  He had completed high school, but had no additional education or vocational

training.  (Id.)

Plaintiff had worked primarily as a painter, sometimes working for himself and other

times working with or for someone else.  (Id. at 171.)  He generally did residential painting

and only occasionally did a commercial job.  (Id.)  He had not belonged to a union.  (Id. at

171-72.)

Asked to describe the impairments that prevent him from working, Plaintiff explained

that it is primarily his left leg and hip.  (Id. at 173.)  Painting required a lot of stooping and

---

[2]Legg-Calvé-Perthes disease is an "[i]diopathic aseptic necrosis of the femoral capital
epiphysis." Merck Manual, 2260 (16th ed. 1992). Its "[m]ajor symptoms are pain in the hip joint and
disturbance of gait, usually of gradual onset and slow progression." Id.  It develops in childhood and
is more common in boys.  Id.

[3]References to "R." are to the administrative record filed by the Commissioner.

climbing up and down ladders, and the pain made this impossible. (<u>Id.</u>) He started having problems with his left leg and hip as a child. (<u>Id.</u>) He was then diagnosed with Legg-Calvé-Perthes disease and was on crutches for two and one-half years. (<u>Id.</u>) His left leg is now four inches shorter than his right. (<u>Id.</u>) He has always had some degree of pain, but it has become so intense at the beginning of the year that he had had to stop working. (<u>Id.</u> at 174.) On a daily basis, the pain is an eight on a scale of one to ten, with ten requiring emergency room attention. (<u>Id.</u>) In addition to the pain being aggravated by climbing and stooping, walking distances also makes it worse. (<u>Id.</u> at 175.) He last saw a specialist in 1996 or 1997, but is not seeing one at the present time because he is uninsured. (<u>Id.</u>) He has seen his general practitioner, Dr. Couts, for a cough and high blood pressure. (<u>Id.</u> at 175-76, 178.) He currently takes an over-the-counter medication, ibuprofen, for pain and uses a hot tub five days a week. (<u>Id.</u> at 176, 178.) He also uses a shoe lift and wears orthopedic shoes. (<u>Id.</u> at 176.) Even so, he is unable to walk without limping. (<u>Id.</u>)

Additionally, Plaintiff had injured his right knee and left ankle when, while self-employed, he fell three-feet off a walk-board. (<u>Id.</u> at 176-77.) His ankle was placed in a cast. (<u>Id.</u> at 177.) He continues to have problems with his right knee swelling if he twists it. (<u>Id.</u>) He has arthritis in his hands. (<u>Id.</u> at 180.)

One doctor, Dr. Burns, told Plaintiff that he would eventually have to have his hip replaced. (Id. at 179.) He was too young[4] to have it then because the replacement lasted only nine to eleven years. (Id.)

Plaintiff is not alleging a mental impairment. (Id.)

Plaintiff further testified that he can sit for only thirty minutes before his hip starts bothering him and he has to move around. (Id.) He can stand, without support, for only five minutes. (Id. at 179-80.) He can walk for fifty to seventy-five feet, but then has to sit down or lean on something. (Id. at 180.) He can lift ten to fifteen pounds. (Id.) He has difficulty squatting and can bend over only if he holds on to something. (Id.) He needs to use a handrail when climbing stairs. (Id.)

Asked to describe his daily activities, Plaintiff reported that he wakes up at 6 o'clock in the morning. (Id. at 181.) During the night, he wakes up two or three times because of the hip pain. (Id.) In the morning, he watches the news, gets something to eat, and drives his wife to work. (Id.) When he returns home, he watches television and does small chores around the house. (Id. at 181-82.) For instance, he vacuums or places the dishes in the dishwasher, but has to periodically sit down. (Id. at 182.) He watches television in the afternoon. (Id.) He and his wife fix dinner together. (Id.) After dinner, they watch television. (Id. at 184.) He goes to bed around 9:00 at night. (Id.) Also, he mows the lawn, but has to use a riding

---

[4]Plaintiff was born on July 14, 1953, and was 52 years old at the time of the hearing.

mower and can do only a few laps before having to sit and rest.  (Id.)  He plants "a few tomatoes" every year.  (Id.)

The only hobby Plaintiff has is fishing.  (Id. at 183.)  He had been fishing with a friend three times the last summer, for a couple hours each time.  (Id.)  His friend has a small boat; after sitting for one-half hours, he has to get up and move around.  (Id.)  He occasionally goes shopping with his wife and carries the light bags.  (Id.)  He sees his daughter approximately three times a year.  (Id.)  Approximately twice a year, someone will come visit him.  (Id. at 184.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from various health care providers, and reports of consultants.

On a disability report, Plaintiff stated that the problems with his left hip had bothered him since birth and had prevented him from working as of February 2, 2005.  (Id. at 123.)  He could no longer work off a step ladder, bend, or lift heavy items.  (Id.)  The job he had held the longest was as a painter supervisor, supervising three to four people, planning the day's tasks, painting, monitoring others' progress, and inspecting the completed work.  (Id. at 124.)  Doing this job, he had had to walk and stand seven hours a day, sit for one, climb for five, kneel for five, crouch for two, crawl for two, handle or grasp big objects for three, reach for three, and write or handle small objects for one.  (Id. at 124-25.)  The heaviest weight he would frequently lift was fifty pounds; the heaviest he occasionally lifted was one hundred.

(Id. at 125.)  He had seen an orthopedist, Michael Burns, M.D., in 2001; another orthopedist, David Fagan, M.D., in 1997 and 1998 after he fractured his ankle; and his general practitioner, Fred Couts, D.O., in 2001 to 2004.  (Id. at 126.)  The only medication he took, Metropolol, was for high blood pressure and had no side effects.  (Id. at 127.)

In another disability report, Plaintiff listed another medication, ibuprofen, that he took for pain.  (Id. at 119.)  It also had no side effects.  (Id.)  He further reported that the pain made it very hard for him to walk.  (Id. at 120.)

On a separate, pain questionnaire, Plaintiff reported that he had constant pain in his left hip.  (Id. at 103.)  The pain is usually an aching pain, but becomes sharp if he twists his hip the wrong way.  (Id.)  Also, the pain becomes worse the longer he is on his feet.  (Id.)  He has always had this pain, but had to quit his job when it prevented him from climbing ladders. (Id.)  To relieve the pain, he has to get off his feet and give his hip a rest.  (Id.)

Completing a function report asking what he was able to do before his conditions that he no longer could, Plaintiff stated that he could no longer climb an extension ladder.  (Id. at 96.)  His hip pain sometimes made it hard for him to get to sleep.  (Id.)  He prepares his own lunch, either heating up soup or making a sandwich, and sometimes cooks breakfast.  (Id. at 97.)  This has not changed since his condition began.  (Id.)  He takes out the trash, mows the lawn using a riding mower, trims the yard, and fixes things around the house.  (Id.)  He and his wife shop every week.  (Id. at 98.)  Once or twice a week, he goes to a local drinking establishment and socializes.  (Id. at 99.)  He does not have any trouble getting along with others.  (Id. at 100.)  Because of his disease, he does have trouble lifting, squatting, bending,

standing, walking, kneeling, and climbing stairs.  (Id.)  When walking, he frequently has to stop and rest for a few minutes.  (Id.)

With the exception of 1999, Plaintiff had reportable earnings from 1970 through 2004, inclusive.  (Id. at 41.)  His annual earnings in 2004 were his second highest – $34,701.00 – and in 2003 were his highest – $36,520.00.  (Id.)

Plaintiff's medical treatment records before the ALJ begin in 1997 and primarily concern the injury to his left ankle that year.

On August 13, 1997, after he fell off scaffolding, Plaintiff's left ankle was x-rayed, found to be fractured, and repaired.  (Id. at 71, 94, 149-52.)  His past medical history was remarkable for gout.  (Id. at 149.)  After a two-day hospital stay, Plaintiff was described as doing "quite well" with antibiotics and physical therapy.  (Id.)  On August 25, Plaintiff returned to Dr. Fagan's office for a follow-up evaluation of his ankle.  (Id. at 148.)  His left leg was feeling much better; however, his right knee was swollen and causing "a considerable amount of discomfort[.]"  (Id.)  On examination, Plaintiff was "in no acute distress."  (Id.)  He was mildly tender medially and not tender laterally.  (Id.)  His range of motion was "fairly good."  (Id.)  He was placed in a short-leg cast and was to stay non-weight bearing.  (Id.)

When Plaintiff returned to Dr. Fagan, on September 29, he reported that his ankle was doing "fairly well."  (Id.)  Again, he was in "no acute distress."  (Id.)  Dr. Fagan recommended that Plaintiff remain non-weight bearing until the screw in his ankle was removed and an x-ray "look[ed] good."  (Id.)  On October 13, the screw was removed.  (Id. at 146-48, 157.)  One week later, Plaintiff reported that his ankle was doing "fairly well," although there was some

swelling and he was still tender about the proximal aspect of his incision. (Id. at 145.) Dr. Fagan recommended that he place twenty to thirty pounds of weight on his leg and begin partial weight bearing. (Id.) A few weeks later, on November 10, Plaintiff still had some swelling about his ankle. (Id.) His range of motion was fairly good. (Id.) He was to return in four weeks. (Id.) If he was doing well then, he was to be released from Dr. Fagan's care. (Id.) If not, he was to participate in physical therapy. (Id.)

On December 8, Plaintiff reported that his ankle was feeling better, although he continued to use a crutch. (Id. at 144.) On examination, his range of motion was very good. (Id.) Dr. Fagan opined that his ankle fracture was healing and Plaintiff needed to use his ankle more. (Id.) He also needed to wean himself off the crutch. (Id.) At Plaintiff's return visit six weeks later, on January 19, 1998, x-rays showed that his fracture was healed. (Id.) He reported occasionally having some soreness in his foot, swelling, and discomfort when he was on it for a prolonged period. (Id.) His range of motion was very good. (Id.) Dr. Fagan concluded that Plaintiff could be on his feet as much as he could tolerate and did not need to return for any further follow-up visits. (Id.)

There follows a five-year gap in Plaintiff's medical records. They resume with his only medical record from Dr. Burns, dated February 14, 2003. (Id. at 142-43.) Plaintiff consulted him for evaluation of his left hip and right knee. (Id. at 142.) Dr. Burns noted that Plaintiff had not sought any medical attention for the past thirty-five to forty years. (Id.) Plaintiff had, however, noticed increasing pain in his left hip region with "occasional popping," continued limping, and continued pain. (Id.) He had been treating his hip pain with ibuprofen only.

(Id.) His right knee he had injured four to five years before. (Id.) Recently, the knee had been swelling with increased activity and at the end of the day. (Id.) This also he had been treating with ibuprofen. (Id.)

On examination, Plaintiff had an obvious limp and a significant leg length discrepancy. (Id.) "He ha[d] slow, cautious, incomplete range of motion of the left hip with pain with internal and external rotation. In terms of his right knee, mild to moderate swelling is noted. There is no specific ecchymosis or deformity noted. He has full range of motion from 0 - 130 degrees with definite crepitus appreciable." (Id.) X-rays showed "rather significant deformity of both the left femoral head and acetablum consistent with his prior hip disorder. Three views of his right knee show[ed] mild to moderate degenerative changes of the patellofemoral compartment and the medial compartment." (Id. at 143.) Dr. Burns asked Plaintiff to stop taking the over-the-counter anti-inflammatory and start taking Lodine, a nonsteroidal anti-inflammatory, and attend physical therapy. (Id.) Plaintiff was to return in one month. (Id.)

One week later, Plaintiff first saw Dr. Couts. (Id. at 141.) Plaintiff denied any chest pain or shortness of breath on exertion. (Id.) He did have hypertension and Legg-Calvé-Perthes disease. (Id.) He was prescribed a blood pressure medication, Vasotec, and was to return in one month. (Id.) When he did, he reported that he had stopped taking his medication because he could not afford it. (Id.) He was prescribed a different medication for his hypertension and was prescribed Naprosyn. (Id.) At his next monthly visit, he reported feeling much better. (Id. at 140.) The following month, however, his blood pressure was increased and he was switched back to the Vasotec. (Id.) In June, Plaintiff reported having

coughing spells.  (Id.)  He was again prescribed an antibiotic, Capoten.  (Id.)  Although he felt good the next month, he was still coughing.  (Id.)  The prescription for Capoten was refilled in December and again in July 2004.  (Id.)  The next time Plaintiff saw Dr. Couts was in July 2004, when his blood pressure was checked.  (Id.)  The next, and last, time he saw Dr. Couts was in October for complaints of leg and back pain and "consultation about going on disability."  (Id. at 139.)  The left leg pain was constant and progressed throughout the day. (Id.)  Dr. Couts noted that Plaintiff's left leg was ½ to ¾ inches shorter than his right.  (Id.)  Dr. Couts also noted that Plaintiff had marked atrophy in the muscle groups of his left Legg (Id.)  He concluded that Plaintiff should not be climbing ladders and should have a magnetic resonance imaging scan ("MRI") of his left hip.  (Id.)

Plaintiff's medical records also include an undated letter to him and his wife from the JFK Clinic at St. John's Mercy Medical Center, explaining that the Clinic was unable to provide their medical needs due to the high volume of already existing patients.  (Id. at 130.) The letter also apparently included a list of area clinics and medical facilities that might be able to assist them.  (Id.)

In addition to the records of Plaintiff's health care providers, the ALJ had before him the report of a March 2005 consultative examination by Raymond Leung, M.D.  (Id. at 131- 36.)  Plaintiff's only complaint was Legg-Calvé-Perthes disease.  (Id. at 131.)  Dr. Leung noted that Plaintiff had not participated in physical therapy or used a cane or walker, but did wear a shoe lift.  (Id.)  On examination, Plaintiff walked with "a moderate to marked limp."  (Id. at 133.)  He was able to heel walk, toe walk, and squat.  (Id.)  He could forward flex to 90

degrees without vertebral tenderness.  (Id.)  He had no difficulty getting on and off the examination table.  (Id.)  "Arm and grip strength were normal."  (Id.)  An x-ray revealed "flattening and deformity of the articular surface at the proximal left femur and . . . some cystic change in the femoral head and neck."  (Id. at 136.)  There was no acute osseous abnormality or joint space narrowing.  (Id.)  Dr. Leung's impression was as follows:

> The left leg is shorter than the right and is atrophied.  He has decreased left leg strength compared to the right.  He walks with a moderate to marked limp.  He also notes having arthritis in the left hip.  He had slight decreased ROM in the left hip.  He is also status post surgery to the left ankle for a fracture in the past. He did show full ROM in the left ankle.  He does have difficulties walking.  He also would have difficulties with prolonged climbing, lifting, and squatting.

(Id. at 133.)

The next month, a counselor, Angela Bennett, completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff.  (Id. at 105-112.)  The primary diagnosis was arthritis in his left hip; the secondary diagnosis was arthritis in his left knee. (Id. at 105.)  The arthritis resulted in exertional limitations of being able to occasionally lift twenty pounds, frequently lift ten pounds, and stand, walk, or sit about six hours in an eight-hour workday.  (Id. at 106.)  It was not noted whether he was limited in his ability to push or pull, including operating hand or foot controls.  (Id.)  He had postural limitations of avoiding climbing, balancing, squatting, kneeling, crouching, crawling, bending, and standing.  (Id. at 107.) He had no manipulative, visual, or communicative limitations.  (Id. at 108-09.)  His only environmental limitation was a need to avoid hazards and heights.  (Id. at 109.)

## The ALJ's Decision

Following the five-step sequential evaluation process, see pages 13 to 17, infra, the ALJ first found that Plaintiff had not engaged in substantial gainful activity after his alleged disability onset date.  (Id. at 14.)  She next found that he had severe impairments of Legg-Calvé-Perthes disease, degenerative changes to the medial compartment of his right knee, and a previous left ankle fracture.  (Id. at 14-15.)  His hypertension, however, had less than a minimal effect on his ability to perform work-related functions and was not severe.  (Id. at 15.)

At the third step of the process, the ALJ found that Plaintiff's impairments, either singly or in combination, were not of Listing-level severity.  (Id.)  The question then was whether they prevented him from performing his past relevant work or any other work existing in significant numbers in the local or national economy.  (Id.)

In order to answer this question, the ALJ assessed Plaintiff's credibility.  (Id. at 15-18.) She noted that he had not seen a physician for his left leg and hip since 1997, was not taking any prescription pain medication, was not using an assistive device, and had a "wide range of daily activities."  (Id. at 17.)  No treating physician had "ever found or imposed any long term, significant, and adverse physical limitations" on his RFC.  (Id.)  She further noted that the records did not show a dramatic increase in his impairments between the time he stopped working as a painter and his applications for DIB and SSI.  (Id. at 18.)  She found his testimony inconsistent, and concluded that his allegations about his limitations were not credible.  (Id. at 18, 20.)

The ALJ next addressed the question of Plaintiff's residual functional capacity ("RFC"). (Id. at 18.)  She concluded that he had the capacity to perform light exertional work.  (Id.) "Light exertional work requires a maximum lifting of 20 pounds; frequent lifting of 10 pounds; and, standing or walking for six out of eight hours per day.  Additionally, the claimant must avoid climbing, balancing, and stooping." (Id.)  Plaintiff's past relevant work was heavy and skilled work.  (Id. at 18-19.)  Plaintiff could not, therefore, perform his past relevant work. (Id. at 19.)  The ALJ noted that: "When the claimant can perform substantially all of the seven primary strength demands required by work at a given level of exertion and the Rule directs a decision of 'not disabled,' the existence of a significant number of occupations in the national economy is met by administrative notice."  (Id.)  Considering Plaintiff's age, i.e., closing approaching advanced age, education, vocationally relevant work experience, and RFC and applying the Medical-Vocational Guidelines, see 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2, the ALJ concluded that, although Plaintiff should avoid climbing, balancing, and stooping, he could "perform substantially all of the seven primary strength demands required to perform light work."  (Id.)

He was not disabled within the meaning of the Act.

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be

"of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alteration added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alterations added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this

requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the

national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  <u>See</u> <u>also</u> 20

C.F.R. § 404.1520(f).  "If [a claimant's] impairments are exertional (affecting the ability to

perform physical labor), the Commissioner may carry this burden by referring to the medical-

vocational guidelines or 'grids,' which are fact-based generalizations about the availability of

jobs for people of varying ages, educational backgrounds, and previous work experience, with

differing degrees of exertional impairment." **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th

Cir. 2001) (alteration added).  "However, when a claimant is limited by a nonexertional

impairment, such as pain or mental incapacity, the Commissioner may not rely on the

Guidelines and must instead present testimony from a vocational expert to support a

determination of no disability." **Id.**  <u>Accord</u> **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th

Cir. 2006).  <u>See</u> <u>also</u> **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the

Guidelines may be employed if the nonexertional impairment does not diminish or

significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3

(S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full

range of work at the appropriate [RFC] level, nonexertional limitations must be taken into

account and a nonguideline determination made."  (alterations added)).  If the claimant is

prevented by his impairment from doing any other work, the ALJ will find the claimant to be

disabled.

    The ALJ's decision whether a person is disabled under the standards set forth above

is conclusive upon this Court if it is supported by "substantial evidence on the record as a

whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d

1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ erred (a) by relying on the medical-vocational guidelines ("the grid") when he suffered from nonexertional limitations and (b) by not consulting a vocational expert ("VE"). The Commissioner contends that the ALJ properly (i) assessed Plaintiff's credibility and (ii) relied on the grid. Plaintiff counters that his challenge to the ALJ's finding is to her reliance on the grid. For the reasons set forth below, the Court agrees that the ALJ erred by relying on the grid.

First, the ALJ erred when concluding that the question of the existence of a significant number of occupations that Plaintiff could perform was answered by his ability to substantially perform all of the seven primary strength demands required by light work.

"Limitations are classified as exertional if they affect [a claimant's] ability to meet the strength demands of jobs."  20 C.F.R. §§ 404.1569a(a), 416.969a(a) (alteration added).  The seven strength demands are "[s]itting, standing, walking, lifting, carrying, pushing, and pulling."  Social Security Ruling 96-8p, 1996 W.L. 374184, * 5 (S.S.A. 1996) (alteration added).  "Each function must be considered separately," regardless of whether the regulations and the Dictionary of Occupational Titles ("DOT") pair them.  Id.  Pushing and pulling are two of the seven strength demands, yet Plaintiff's ability to do either was not addressed by the ALJ or the consultant completing the PRFCA.  See **Myers v. Apfel**, 238 F.3d 617, 621 (5th Cir. 2001) (remanding case in which ALJ failed to address, inter alia, claimant's ability to push and pull on a regular, continuing basis).  Failing to address Plaintiff's ability to push or pull, including operating foot controls with a discrepancy in length between his two legs, the ALJ erroneously concluded that he was able to perform the seven strength demands of light work and that her analysis at step five could end there.

Second, the ALJ erred by concluding that Plaintiff could perform the full range of light work although he had to avoid climbing, stooping, and balancing.

"Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands . . . are considered nonexertional."  20 C.F.R. §§ 404.1569a(a), 416.969a(a) (alterations added).  An example of a nonexertional limitation

is "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. §§ 404.1569a(c)(iv), 416.969a(c)(iv). "Before denying disability benefits at step five when a claimant has a nonexertional limitation(s), [an ALJ] must:

> (1) take or produce vocational evidence such as from a vocational expert, the DOT or other similar evidence (such as a learned treatise); or
>
> (2) provide notice that [the ALJ] intends to take or are taking administrative notice of the fact that the particular nonexertional limitation(s) does not significantly erode the occupational job base, and allow the claimant the opportunity to respond before [the ALJ] den[ies] the claim.

Social Security Acquiescence Ruling 01-1(3), 2001 WL 65745, *4 (S.S.A. 2001) (alterations added). If, however, there is a Social Security Ruling "that includes a statement explaining how the particular nonexertional limitation(s) under consideration in the claim being adjudicated affects a claimant's occupational job base" that Ruling will support a finding that there are jobs in the national economy that the claimant can do. Id. at *5. In such cases, the ALJ's decision should include a citation to the governing Ruling. Id.

A Social Security Ruling, 96-9p, addresses the effects that postural limitations such as Plaintiff's have on the full range of sedentary work, which requires a lesser exertional level than light work. See 20 C.F.R. §§ 404.1567(a) (defining sedentary work) and (b) (defining light work) and 416.967(a) (sedentary work) and (b) (light work). That Ruling provides that postural limitations related to such activities as climbing ladders or scaffolds, balancing, kneeling, crouching, or crawling do not "usually erode the occupational base for a full range

of unskilled sedentary work significantly because those activities are not usually required in sedentary work."  Social Security Ruling 96-9p, 1996 W.L. 374185, *7 (S.S.A. 1996).  A limited ability to balance, however, may significantly erode "the unskilled sedentary occupational base" if the limitation is in "balancing even when standing or walking on level terrain."  <u>Id.</u>  Consequently, the RFC must define what is meant by limited balancing.  <u>Id.</u> "Consultation with a vocational resource may be appropriate[.]"  <u>Id.</u> (alteration added).

Additionally, "[a]n ability to stoop occasionally . . . is required in most unskilled sedentary occupations."  <u>Id.</u> (alterations added).  "A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work."  <u>Id.</u> "Consultation with a vocational resource may be appropriate[.]"  <u>Id.</u> (alteration added).

The conclusions in this Ruling were preceded by similar conclusions in an earlier Ruling.  In Social Security Ruling 83-14, it was noted that the <u>Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles</u> ("SCO"), a DOT supplement, rated specific occupations "for climbing or balancing; stooping, kneeling, crouching or crawling; reaching, handling, fingering, or feeling; talking or hearing; and seeing."  Social Security Ruling 83-14, 1983 W.L. 31254, *1 (S.S.A. 1983).  "Maintaining body equilibrium" may "affect the capacity to perform certain jobs at all levels of physical exertion."  <u>Id.</u> at *2. "Relatively few jobs in the national economy require ascending or descending ladders and

scaffolding." Id.  On the other hand, "[i]n jobs performed in a seated position which require the operation of pedals or treadles, a person must have the use of his or her legs and feet." Id. (alteration added).  "[T]o perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job)." Id.

Despite the cautions expressed in Social Security Rulings 96-9p and 83-14 about the effect balancing and stooping might have on a claimant's ability to perform the exertional requirements of light work, the ALJ found that the DOT and SCO supported her conclusion that Plaintiff could perform such work although he needed to avoid climbing, balancing, and stooping.

## Conclusion

"[T]he grid only applies if the individual is capable of performing a wide range of jobs at the designated level – i.e., sedentary, light or medium."  Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) (alteration added).  The ALJ's conclusion, without any consultation with or support from a VE, that Plaintiff could perform a wide range of jobs at the light level lacks substantial evidence on the record as a whole because (a) it does not address the question whether he can push or pull and (b) does not address the question of the effect of his need to avoid climbing, balancing, and stooping on his ability to perform such jobs.  The case must be remanded for these questions to be answered.  Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of July, 2007.